**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WENDY M. DAVIDSON, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> E\*TRADE FINANCIAL CORPORATION, MITCHELL H. CAPLAN, and ROBERT J. SIMMONS, <br><br> Defendants. | No. 07 CV 10400 <br><br> CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS <br><br> **JURY TRIAL DEMANDED** |

Plaintiff alleges the following based upon the investigation by Plaintiff's counsel, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding E\*TRADE Financial Corporation ("E\*TRADE" or the "Company"), and information readily available on the Internet. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF ACTION

1.    This is a federal class action on behalf of purchasers of E\*TRADE securities between December 14, 2006 and November 9, 2007, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.    E\*TRADE, through its subsidiaries, offers financial services to retail and institutional customers worldwide, including retail investments and trading, checking, money market and savings accounts. In addition, the Company offers mortgage and home equity

products, real estate loans, and various consumer loans.

3.    Throughout the Class Period, defendants failed to disclose material adverse facts about the Company's business, prospects and financial condition. Specifically, defendants failed to disclose or indicate that: (1) the Company was experiencing increased delinquencies in its mortgage and home equity portfolios; (2) the Company had failed to adequately reserve for loan losses; (3) as such, the Company would be forced to take $95 million in charge-offs and provision expenses of $245 million in the second half of 2007; (4) the Company had failed to timely record impairments on certain securities, and as a result, such portfolios were materially overvalued; and (5) as a result of the foregoing, the Company's statements about its 2007 financial and operational results were lacking in any reasonable basis when made.

4.    On September 17, 2007, the Company shocked investors when it announced that it was exiting the wholesale mortgage business, restructuring its institutional brokerage business, and revising its previously issued 2007 financial guidance. The Company disclosed that it expected charge-offs of $95 million dollars, provision expenses of $245 million in the second half of 2007 due to an increased allowance for loan losses, and that it expected "severance, restructuring and other exit charges" of $32 million as a result of its decision to exit and restructure the businesses. Additionally, the Company stated that it was revising its earnings guidance for 2007, to anticipated earnings per share ("EPS") ranging between $1.05 and $1.15 for the year, significantly lower than the Company's previously issued guidance in the range of $1.53 to $1.67 EPS for the year.

5.    As a result of this news, over the next six trading days E*TRADE shares fell $2.32 per share, or more than 16.3 percent, to close on September 25, 2007 at $11.89 per share

on heavy trading volume.

6.    Even after these revelations, the Company's stock price was still artificially inflated. On November 9, 2007, E*TRADE revealed that it would take a write-down on a portfolio of securities and mortgage-backed CDOs. E*TRADE also reported that the Securities and Exchange Commission had opened up an inquiry of the firm's loans and securities portfolios. Following this disclosure, a Citigroup analyst raised concerns of the Company's future viability. On November 12, 2007 (the first trading day after the write-down was announced), the Company's stock fell $5.04 per share, or 59 percent, to close at $3.55 per share on heavy trading volume.

7.    As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

9.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

10.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District. Additionally, the Company's

principal executive offices are located in this Judicial District.

11.    In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

12.    Plaintiff Wendy M. Davidson, as set forth in the accompanying certification incorporated by reference herein, purchased E*TRADE securities at artificially inflated prices during the Class Period and has been damaged thereby.

13.    Defendant E*TRADE is a Delaware corporation with its principal executive offices situated at 135 East 57th Street, New York, New York.

14.    Defendant Mitchell H. Caplan ("Caplan") was, at all relevant times, the Company's Chief Executive Officer ("CEO").

15.    Defendant Robert J. Simmons ("Simmons") was, at all relevant times, the Company's Chief Financial Officer ("CFO") and Principal Accounting Officer.

16.    Defendants Caplan and Simmons are collectively referred to hereinafter as the "Individual Defendants."

17.    During the Class Period, the Individual Defendants, as senior executive officers and/or directors of E*TRADE, were privy to confidential and proprietary information concerning E*TRADE, its operations, finances, financial condition and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning E*TRADE, as discussed in detail below. Because of their positions with E*TRADE,

- 4 -

the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

18.    The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of E*TRADE's business.

19.    The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

- 5 -

20.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NASDAQ stock market and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to E*TRADE's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of E*TRADE securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

21.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct which operated as a fraud or deceit on purchasers of E*TRADE securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding E*TRADE's business, operations and management and the intrinsic value of E*TRADE securities; (ii) allowed the Individual Defendants to sell 122,211 shares of their personally-held E*TRADE stock for gross proceeds in excess of $2.8 million; and (iii) caused Plaintiff and other members of the Class to purchase E*TRADE securities at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

22.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased E*TRADE securities between December 14, 2006 and November 9, 2007, inclusive, and who were damaged

thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

23.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, E*TRADE common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by E*TRADE or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

24.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

25.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

26.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

          (a)     whether the federal securities laws were violated by Defendants' acts as

- 7 -

alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of E*TRADE;

(c)    whether the price of E*TRADE common stock was artificially inflated during the Class Period; and

(d)    to what extent the members of the Class have sustained damages and the proper measure of damages.

27.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background

28.    E*TRADE, through its subsidiaries, offers financial services to retail and institutional customers worldwide, including retail investments and trading, checking, money market and savings accounts. In addition, the Company offers mortgage and home equity products, real estate loans, and various consumer loans.

29.    Since its inception, E*TRADE generated revenues from the commissions it charged consumers who traded stocks on its website. In 2003 the Company began to transition itself into more than just an online broker for stock trades. At that time, in an attempt to cash in

on the housing boom, the Company purchased mortgages, home-equity loans and other

mortgage-related assets. Shortly thereafter, the Company began originating its own loans. As a

result, interest income from its loans became the main driver for the Company's growth as it

became less reliant on brokerage fees. Unbeknownst to investors, this growth would be short-

lived because the Company's mortgages, home-equity loans and other mortgage-related assets

were composed of sub-prime loans. Furthermore, during the Class Period, the Company was

experiencing a rise in delinquency rates in both its mortgage and home equity portfolios. As a

result, the Company's mortgages, home-equity loans and other mortgage-related assets were

materially overvalued at all relevant times.

**Defendants' Materially False and Misleading**
**Statements Issued During the Class Period**

30.    The Class Period begins on December 14, 2006. On that day, E*TRADE held a

conference call with investors and financial analysts. During this call, Defendant Caplan, in

relevant part, stated:

> *We have long said that we define ourselves as a growth Company based on our*
> *ability to generate annual revenue growth of 10% to 15%, earnings growth of*
> *15% to 20%, with an operating margin approaching 50%.* From our current
> inflection point, the Company is positioned to not only meet, but exceed those
> growth targets in 2007. Based off the current 2006 consensus revenue and GAAP
> EPS estimate, *the annual guidance we establish today reflects revenue growth*
> *of 14% to 24% from the low to high end of the range, GAAP EPS growth of*
> *15% to 26%, with an annual operating margin of 47%. Most importantly, we*
> *expect to deliver these strong results even as we make additional investments in*
> *marketing and service.*
>
>                                    * * *
>
> We expect to generate these results as a function of three core growth initiatives in
> 2007. The first is building on the success that we achieved year-to-date, we will
> continue to drive growth in target segment accounts. We will achieve this through
> a continued investment to attract and retain these target segment accounts while
> migrating Main Street into this segment, all through our investment relationship
> managers and marketing. Second, we will deliver continued improvement and

profitability throughout the model as the result of greater integration, scale, and efficiencies, including the full-year benefit of Harrisdirect and Brown, as well as moving clearing under the bank. And third, we will generate accelerated growth through success in our Corporate Services and international operations, two avenues for growth that are unique to our model. In addition to these initiatives, but not embedded in our guidance, is the continued opportunity to supercharge growth, scale, and efficiency through accretive acquisitions in any of the core areas of our business. This includes opportunities both domestically, as well as internationally, and across transactions, cash and credit originations, or asset aggregation.

[Emphasis added.]

31.    On January 18, 2007, the Company issued a press release titled "E*TRADE

FINANCIAL Corporation Announces Fourth Consecutive Year of Record Results, " which, in

relevant part, stated:

E*TRADE FINANCIAL Corporation (NASDAQ: ETFC) today announced record results for its fourth quarter ended December 31, 2006, reporting net income of $176.7 million, or $0.40 per share, compared to $129.4 million, or $0.32 per share a year ago. Total net revenue for the fourth quarter increased to $628.8 million from $478.9 million a year ago. Net operating interest income after provision for loan losses for the quarter increased to $363.5 million - representing 58 percent of total net revenue. The Company's record net operating interest income was the combined result of a 39 percent increase in enterprise interest-earning assets and a 28 basis point increase in enterprise net interest spread compared to the year ago period. Non-interest income increased to $265.3 million from $236.7 million in the year ago period. For the year ended December 31, 2006, the Company reported record net income of $628.9 million, or $1.44 per share, on total net revenue of $2.4 billion. Excluding previously reported acquisition-related integration expenses, the Company earned $1.49 per share. This compares to net income of $430.4 million, or $1.12 per share, on total net revenue of $1.7 billion in 2005.

"In 2006 the Company delivered a fourth consecutive year of record results while successfully integrating two key acquisitions *and strategically investing in product, service and marketing to strengthen the future performance of the franchise,*" said Mitchell H. Caplan, Chief Executive Officer, E*TRADE FINANCIAL Corporation. *"As a result of this success, we enter 2007 ideally positioned to capitalize on the secular growth trends of the industry, and we will continue to seek out targeted investments to build stronger client relationships*

- 10 -

*and drive broader product engagement in the US and abroad."*

[Emphasis added. Internal references omitted.]

    32.    On April 18, 2007, the Company issued a press release titled "E*TRADE

FINANCIAL Corporation Announces First Quarter Earnings of $0.39 Per Share on Record

Revenue," which, in relevant part, stated:

> E*TRADE FINANCIAL Corporation (NASDAQ: ETFC) today announced results
> for its first quarter ended March 31, 2007, reporting net income of $169.4 million,
> or $0.39 per share, compared to $142.5 million, or $0.33 per share a year ago.
> Total net revenue for the first quarter increased to a record $645.0 million from
> $598.3 million in the year ago period.
>
> "We are extremely pleased with the response to our marketing and service
> investments this past quarter which generated record net new accounts, with
> continued strong growth in our target segments, and record levels of customer
> assets and cash," said Mitchell H. Caplan, Chief Executive Officer, E*TRADE
> FINANCIAL Corporation. "The success we are seeing in attracting and retaining
> high-value customers is clearly beneficial to the long-term growth of the
> franchise."
>
> The Company also announced today that its Board of Directors has authorized an
> additional $250 million stock repurchase plan. In addition to this program, the
> Company has $34 million remaining in its active program originally announced in
> December 2004. Under the outstanding authorizations, repurchases may be made
> through open market and privately negotiated transactions at times and in such
> amounts as management deems appropriate.
>
> "Although the broad based markets have been strong, *the recent volatility in the
> macroeconomic environment has affected retail customer behavior and
> engagement levels. As a result, we are reducing our 2007 earnings estimate to
> better reflect the muted retail environment we are now experiencing as
> compared to our expectations at the end of 2006*," continued Mr. Caplan.

[Emphasis added.]

    33.    Also on April 18, 2007, E*TRADE held a conference call with investors and

financial analysts. During the call, Defendant Caplan, in relevant part, stated:

- 11 -

Equally as important, 79% of existing investing customers who opened new deposit accounts during the quarter increased their assets quarter over quarter, and nearly half of them increased their assets by 20% or more, all driving record asset levels, again a benefit of optionality, both for the customer and for the long-term franchise. As the data shows, we are building deeper and stronger relationships with our customers by offering the right products at the right time. Once engagement trends improve to more normal levels, we expect to realize the full economic benefit of this growing base of high-quality customers. *With much having been reported about rising delinquencies and default rates among subprime asset portfolios, we also recognize that we are operating in a changing credit environment. Given our historic and continued strict discipline with respect to credit, we believe that the risk to our balance sheet is significantly mitigated compared to financial institutions with a more traditional mix of assets.* We recognize that we are not immune to the current environment, and *we are anticipating upward trends in delinquencies and charge-offs in our portfolio versus last year levels and even versus assumptions when we gave guidance in December.*

To set some context, in 2006, we booked $45 million in provision for loan losses. Embedded in our guidance for 2007 last December, we forecasted an increase in our provisions of 51% to $68 million or to approximately $17 million per quarter, based both on the growth and the seasoning of our portfolio. In the first quarter, we reported $21 million of provision, an extra $4 million or $0.005 per share against earnings. We believe that this is the result of what is happening in the broader credit environment. If you annualize these trends, it translates into an additional $0.02 per share provision expense for 2007 over and above what was embedded in our original guidance. Exercising prudence and for guidance purposes, we are assuming provision expense of $96 million for the year or quarterly provision expenses of approximately $25 million for the balance of the year. This translates into $0.04 a share per headwind to our original earnings guidance for the year. This number represents a 2% reduction to the mid point of our original guidance and is relatively contained, given the benefit of the credit quality of our portfolio.

Look across our $37 billion loan portfolio, over $26 billion is in one to four-family mortgages and home equity products, $7 billion is margin debt from our investing customers, and the remainder is legacy consumer loans that are in run-off mode. Across the entire mortgage portfolio, our dollar weighted average FICO score remains at a solid 735. The average loan-to-value ratio is 73% and the average debt-to-income ratio is 35%, all numbers consistent with this time last year. In our one to four-family first lien portfolio, the average FICO is 738, LTV's averaged 68%, and DTI averages 34%. As we continue to grow our mortgage portfolio throughout this year, growth will tend to be more heavily weighted, 70% in one to four-family first lien products meeting that criteria. In second lien

product, the average FICO is 732, LTV's averaged 79%, with an average DTI of 36%. *Specifically with respect to subprime loans, based on the standard industry definition of borrowers with FICO scores of 620 or below, we hold approximately $50 million of balances, or less than one-fifth of 1% of our $29 billion whole loan portfolio, a de minimis amount.*

* * *

Also, in response to a question regarding an increase in the Company's provisions for loan

losses, Defendant Caplan stated:

Q: [ANALYST]: ... And then could you give us some more color around the uptick in the charge-offs in the quarter? Obviously, you constantly talk about the portfolio and the FICO scores and the LTV's, clearly a healthy portfolio. But would be surprised to see that big of an uptick quarter over quarter, despite what's going on in the subprime world considering how little of subprime business you guys have you have. So give us a sense as to what you're seeing out there and what's –

MITCHELL CAPLAN: Happy to do it. So as I said, last year we had chargeoffs as you saw of about $45 billion. We assumed, as I said in the prepared remarks -- what? $45 million, sorry. $45 million. Yes, good point. [LAUGHTER] And this quarter, as we were really building the guidance for this here, don't forget we have had pretty consistent growth in the balance sheet. So *under any circumstances, notwithstanding the fact that we have stayed completely disciplined about focusing on what we call prime and really super-prime borrowers, you're going to see an increase in charge-offs just as a result of the increasing balance sheet size.* We also assumed that, as the balance sheet, which is growing – has been growing continues to season, you would see an uptick. So, as *we were modeling for this year last year and then gave guidance in December, we had always assumed that it would go up to the $68 million or about $17 million a quarter*. So in our model we had always presumed that that was going to be the case having nothing to do with a more difficult credit environment in any meaningful way, but simply as a result of both size of the balance sheet and seasoning of the balance sheet.

The incremental difference this quarter that we saw of the $17 million that we have expected to about $21 million we believe is the result of what's happening in the overall credit market, which is this discussion about what's happening in subprime, what's happening in Alt-A, and to the extent it that, more importantly, any of that is bleeding up into the general prime and super-prime market. Our view I guess going forward is -- and we were trying to be prudent about this -- is that as you looked forward for the rest of this year, we could simply have said, all right, we saw a $4 million unexpected increase. If you annualize that, it would

have been somewhere in the neighborhood of $16 million or $0.02. But we believe, given what we're seeing and what we're trying to prepare for, is the worst case scenario absent an absolute mortgage meltdown that you'd see a lost severity trend in the small percentage of our portfolio that we discussed, literally increasing by 50%. That that's what would drive the increase of the $28 million.

You know, it may not come out to bear, but I guess in our mind, given everything we're seeing, we're better off being prudent around discussing this, and then putting context around the size of the overall balance sheet and *then making it being clear for the first time ever that when you look at what the market is concerned about in either subprime or [Alt-A], one of them is less than one-fifth of 1% of the overall whole loan balances and the other one is less than 0.5%. So I feel pretty good when I recognize that over 99% of our whole loan portfolio is, fact in, in those products which have traditionally not been impacted in markets like this.*

[Emphasis added.]

34.    In response to these statements, the next trading day the Company's shares fell $1.04 per share, or 4.7 percent, to close on April 19, 2007 at $21.09 per share, on heavy trading volume.

35.    On July 25, 2007, the Company issued a press release titled "E*TRADE FINANCIAL Corporation Announces Second Quarter Results," which, in relevant part, stated:

E*TRADE FINANCIAL Corporation (NASDAQ: ETFC) today announced results for its second quarter ended June 30, 2007, reporting net income of $159 million, or $0.37 per share, compared to $156 million, or $0.36 per share a year ago. The results in the second quarter of 2007 produced a 39 percent operating margin including approximately $35 million of pre-tax expense, or $0.05 per share, for certain legal and previously disclosed regulatory matters related to the Company's institutional equity business. Excluding the impact of these items, the Company generated earnings of $0.42 per share and achieved a 45 percent operating margin. Total net revenue for the second quarter increased 9 percent year over year to a record $664 million. Net operating interest income after provision for loan losses increased 15 percent year over year to a record $384 million - representing 58 percent of total net revenue. The Company's retail client assets increased to a record $213 billion including growth in total customer cash and deposits of $1.9 billion - a more than six-fold increase versus the year ago period.

*The Company also narrowed its 2007 pro-forma earnings guidance to a range*

- 14 -

*of $1.58 - $1.72 per share from the previous range of $1.55 - $1.75, leaving the mid-point of $1.65 unchanged. This pro-forma range excludes the $0.05 per share of expense for certain legal and regulatory matters realized during the second quarter. Including these expenses, the Company now expects to earn $1.53 - $1.67 per share on a GAAP basis in 2007.*

*"Our second quarter results demonstrate the strategic and economic success we have achieved through investments in product, service and marketing over the past several years," said Mitchell H. Caplan, Chief Executive Officer, E\*TRADE FINANCIAL Corporation. "We delivered record performance in the quarter while improving the overall quality of revenue and earnings through continued growth and engagement led by our high-value, target segment accounts."*

[Emphasis added. Internal references omitted.]

36.    Also on July 25, 2007, E\*TRADE held a conference call with investors and

financial analysts. During the call, the Individual Defendants and other Company representatives,

in relevant part, stated:

Q: [ANALYST HOWARD CHEN] … Mitch, just switching gears, we're now a few quarters into the launch of the loan optimizer. It seems like your margin loan balances are tracking higher. From what you can see, is at all of function of your customers shifting their leverage away from HELOCs or credit cards to margin loans or is that simply just a function of overall equity market appreciation? Put another way, are you happy with the way that the loan optimizing is progressing?

MITCHELL CAPLAN: Yes, but again it is early days and so we would hope to continue to see -- has the loan optimizer been as successful as the cash optimizer? No. But again, it is early days and we expected it to take longer. When you think about the growth that we experienced in margin in this past quarter and, again, I think what we have seen so far in Q3, we think that most of that is driven, whether it is the loan optimizer or otherwise, by continued engagement within the target segment.

Q: [JARRETT LILIEN] The thing is, the loan optimizer is a good awareness tool right now and it is doing its part, but just reiterating what Mitch said, the real growth is additional accounts. It is the growth in the target segment that is driving – drives 76% of our revenues. It grew 29% in the quarter. That is what is driving assets, cash, DARTs, and margin.

[ANALYST]: Okay, thanks, Jerrett [sic]. Thanks, Mitch.

ROBERT SIMMONS: Let me clarify one other point that was made earlier by Mitch. It was a question around the vintages and stuff. I think if you look at our total book as of the end of this quarter, you can see that the growth in our loan book came exclusively in one to fours and margin, which are our highest quality loan categories. If you look at our consumer and our HELOC book, they were both down. So the question with respect to vintages, we do not have zero in '06 vintages in our book. We will give you some more details when we file our Q. But just wanted to clarify that the reduction of $400 million related to our HELOC book this quarter and we would expect that sort of trend to continue.

MITCHELL CAPLAN: Right, and I guess I was responding to was what Matt [Drury], who was sitting next to me, was talking about, which is *within the '06 vintage, we have zero in subprime.* So I think that was the issue that I was responding to and I guess the sheet of paper that I have been seeing. *So again, our subprime quarter over- quarter continued to stay flat and declined a bit. Then what could be thought of as subprime, I guess, in the '06 vintage is zero at this point.*

[Emphasis added.]

37.    As a result of this news, E*TRADE shares fell $1.41 per share, or almost 7 percent, to close on July 26, 2007 at $19.05 per share on heavy trading volume.

38.    On August 11, 2007, *The Wall Street Journal* published an article titled "MarketWatch Weekend Investor: E*Trade Financial: An Online Broker in the Clothing of a Mortgage REIT?" The article, in relevant part, stated:

With the mortgage market going through an upheaval, you would think Mitch Caplan would be ducking for cover.

*As the mortgage mess continues to evolve, the company he runs, E*Trade Financial Corp., is clearly in the thick of it, so much so that after reviewing its financial statements, you might think it was a mortgage REIT disguised as an online broker.*

It isn't, of course, but the reinvigoration of E*Trade's stock in 2003, then again in 2005, would appear to coincide with an increase in purchasing mortgages, home-equity loans and other mortgage-related assets. While E*Trade is hardly the only financial-services firm or broker to have mortgage exposure, *it appears to be much greater at E*Trade than the likes of Charles Schwab.*

- 16 -

Income from interest earned on those assets, the company warns in the risk-factor section of its Securities and Exchange Commission filings, *"has become an increasingly important source of our revenue." So important that in 2005 interest income shot ahead of brokerage fees as the top sales generator, steadily edging higher through the second quarter, when it accounted for 58% of revenue, up from 44% in all of 2004.*

Most of that is tied to consumer loans, the majority of which are first and second mortgages purchased from others, such as National City Corp. and the mortgage arm of J.P. Morgan Chase, as well as those generated by E*Trade itself. *The company also holds a large portfolio of mortgage-backed securities.*

Citing the large mortgage portfolio, analyst Prashant Bhatia of Citigroup, who rates E*Trade a "hold," told his clients in a report that *the company "has much higher interest-rate risk relative to its peers."*

Sean Egan, managing director of Egan-Jones Ratings Co., an independent credit-ratings organization, takes it a step further: *"E*Trade is a broker, not an asset holder and therefore the rapid buildup is a concern. The company has moved out of its core expertise and is taking on some risky assets in the process."*

Just how risky? Mr. Bhatia and Mr. Egan have both voiced concern that *E*Trade isn't well enough reserved to cover mortgage losses. "With problems in the mortgage market," Mr. Egan says, "future mortgage-related earnings are likely to fall." For example, E*Trade's allowance for loan losses fell to 45% of loans that are likely to go bad from 91% in the first six months of this year. Bad loans during the period, meanwhile, rose by 13%. Along those lines, a new risk factor in the company's 10-Q filed Thursday warns that since "a substantial portion of our asset portfolio" is composed of mortgages, "instability in the consumer credit markets and credit trends" may force an increase in the provision for loan losses, which would take a bite out of future results.*

Which gets us back to Mr. Caplan, who appeared to be taking all of this in stride when I caught up to him Friday. "We are absolutely, positively not immune to what is happening in the macro market," he says. But he disagrees that E*Trade has been using mortgages like steroids to juice his company's performance. "Here's where you're not connecting the dots," he says. He then went through a history of the company and explained that in 2003 E*Trade shifted away from commissions as the biggest source of revenue because they didn't appear to be "a long-term sustainable franchise."

The company went after more affluent customers, using "the massive growth in cash" from them to increase its real-estate portfolio. Sounded good at the time, and Mr. Caplan believes it sounds just as good today. *The difference between his*

*company and many other mortgage investors, he says, was that E\*Trade stuck
with higher-quality "generic" first mortgages, accepting smaller returns in
exchange.*

"Do I worry more about home-equity loans," which are almost the same size as
E\*Trade's first-mortgage portfolio? "Of course I do," he says. *But he stresses
that earnings estimates for the year haven't changed, a sign of his confidence
that E\*Trade won't get blindsided by the mortgage mess.*

Still, going forward, even Mr. Caplan acknowledges that mortgages aren't likely to
be the investment they used to be. *Not to worry.* He says he could use the cash to
pay down wholesale borrowings or even buy back shares. *Sounds good on paper,
but as investors have learned lately, when it comes to anything related to
mortgages, it's what happens in practice that counts.*

[Emphasis added.]

39.    Over the next three trading days, E\*TRADE shares fell $3.10 per share,

or over 18.2 percent, to close on August 15, 2007 at $13.91 per share on heavy trading volume.

40.    On August 16, 2007, the Company issued a press release titled "E\*TRADE

FINANCIAL Corporation Issues Supplemental Portfolio Disclosure," which, in

relevant part, stated:

E\*TRADE FINANCIAL Corporation (NASDAQ: ETFC) released supplemental
disclosures today related to the composition and funding sources for its balance
sheet. The Company provided a presentation containing additional information to
its June 30, 2007 quarterly results, including expanded transparency on the credit
quality of its mortgage and securities portfolios. This presentation can be found at
https://investor.etrade.com. In addition, the Company stated that it has seen no
material changes to date with respect to the availability, pricing or margin on its
wholesale funding sources, including repurchase agreements. Management
maintains that it does not believe that the current market capitalization accurately
reflects the financial strength and performance of the business.

Selected highlights from the presentation include:

☐ The Company's $15.7 billion first lien mortgage portfolio is supported by high
FICO scores, low Loan-to-Value ratios(LTV) and private mortgage insurance
☐ All first lien mortgage loans with an 80% or higher LTV are protected by

- 18 -

private mortgage insurance
☐ $9.2 billion, or 74%, of its home equity portfolio is to borrowers with FICO
scores of 700 and higher
☐ $12.6 billion, or 99%, of mortgage-backed securities are rated AAA
☐ 97% of its Asset-backed Securities portfolio is rated investment grade
☐ Consistent and growing base of retail customer cash
☐ $10 billion in excess wholesale borrowing capacity from the Federal Home
Loan Bank

41.     Also on August 16, 2007, *TheStreet.com* published an article titled "E*Trade

Bounces Back," which in relevant part stated:

> E*Trade Financial bounced back from a steep selloff Thursday after the online
> broker said its *"financial health ... is sound." Shares of the online broker closed
> down 3% after earlier dropping as much as 22% amid worries about a possible
> write-down. Ratings agency Egan-Jones downgraded E*Trade debt to* to [sic]
> *B+ from BB-, saying the value of E*Trade's $46.1 billion of mortgages and
> loans receivable "probably needs to be marked down."*

> An E*Trade spokeswoman said in a statement that the company has not seen any
> "material changes to date with respect to wholesale funding availability, pricing or
> margin, including repurchase agreements."

> She also denied a rumor that the brokerage firm was freezing accounts.

> *"We continue to reiterate that while the volatility of the mortgage industry does
> impact us, the financial health of the company is sound," the spokeswoman
> added. "We believe the fear reflected in the current market capitalization is
> unfounded and are working diligently with investors to reassure them of the
> franchises' strength."*

> E*Trade's stock closed down 36 cents to $13.55.

[Emphasis added.]

42.     Defendants' statements, as described in ¶¶ 29-32, 34, 35, 37, 39, and 40, above,

were materially false and misleading when made because defendants failed to disclose or indicate

that: (1) the Company was experiencing increased delinquencies in its mortgage and home equity

portfolios; (2) the Company had failed to adequately reserve for loan losses; (3) as such, the

- 19 -

Company would be forced to take $95 million in charge-offs and provision expenses of $245

million in the second half of 2007; (4) the Company had failed to timely record impairments on

certain securities, and as a result, such portfolios were materially overvalued; and (5) as a result

of the foregoing, the Company's statements about its 2007 financial and operational results were

lacking in any reasonable basis when made.

**Disclosures at the End of the Class Period**

43.    On September 17, 2007, the Company issued a press release announcing, among

other things, that it will exit the wholesale mortgage and is revising its earnings guidance for

2007. The Company's press release, in relevant part, stated:

> E*TRADE FINANCIAL Corporation (NASDAQ: ETFC) today announced plans
> to realign its balance sheet and streamline business operations to focus on its retail
> growth opportunity. *The Company is exiting or restructuring non-core
> businesses that lack a direct and strategic connection with its retail customers.*
> The Company is also accelerating plans to shift the composition of its balance
> sheet toward retail assets and liabilities and to synchronize balance sheet growth
> with customer engagement. *In addition, the Company is increasing the provision
> for loan losses due to charge-offs expected as a result of the disturbance in the
> credit markets. As a result of these actions, E*TRADE FINANCIAL is revising
> 2007 earnings guidance to account for higher provision for loan losses,
> potential securities impairments, reduced balance sheet growth and
> restructuring charges.* Despite these factors, the Company confirms that its
> balance sheet funding sources remain sound and the Company remains well
> capitalized based on regulatory standards.
>
> * * *
>
> "Today's announcement addresses the recent shifts in the global financial markets
> and allows us to focus on accelerating plans to further align both our balance sheet
> and business operations with our core asset - the retail customer," said Mitchell H.
> Caplan, Chief Executive Officer, E*TRADE FINANCIAL Corporation. "Growth
> in our target segment continues at record levels. The actions we have taken better
> position the franchise for future growth and high quality earnings."
>
> The specific details of the plan, and expected financial implications (all figures
> are pre-tax, with the exception of EPS and net income), include:

–Balance sheet growth and composition strategy. For the foreseeable future, balance sheet growth, if any, will be driven by the continued growth in cash and deposit balances from retail investing and trading customers. Through at least 2008, interest-earning assets will remain relatively flat with third quarter levels, with growth in customer cash and deposits used to replace wholesale fundings. *The Company plans to reduce balances in home equity, consumer loans and securities, replacing these assets as they pay down or mature with margin debt and prime first lien mortgages from retail customers. The planned run-off in home equity loans, consumer loans and securities will reduce both the overall level of risk within the portfolio and expected future loss levels.* Through this initiative, the composition of the balance sheet will shift significantly toward retail assets and liabilities, reducing wholesale contributions to revenue and net income. The Company anticipates making this transition in an orderly fashion over the next 18-24 months. Given the expectations for limited balance sheet growth going forward, the capital needs of the overall business will be reduced - creating opportunities in higher return investments such as accelerated share and debt repurchase activity or other initiatives to strengthen the business.

–Increased allowance for loan losses. Given the significant deterioration in the mortgage market in August and particularly the pace of change in the performance of home equity loans in August, *the Company expects charge-offs of $95 million dollars and total provision expense of $245 million in the second half of 2007. The majority of this provision is expected to be recorded in the third quarter.* With this additional reserve, allowance for loan losses as a percentage of non-performing loans is expected to increase to 75 percent based on assumptions for the second half of the year, up from 45 percent on June 30, 2007. Within home equity loans, where the Company and the marketplace have seen the most significant stress, the coverage will be approximately 100 percent, up from 51 percent as of June 30, 2007.

–Potential for securities impairments. *Embedded in the Company's modified guidance is an assumed securities impairment of up to $100 million in the second half of 2007. The expected impairments in the guidance are predominantly related to deterioration in the performance of asset-backed securities comprised of second lien loans and CDOs (collateralized debt obligations).*

–Exiting and restructuring non-core businesses. *The Company will exit its wholesale mortgage operations* and will streamline its direct mortgage lending business to focus on its retail franchise. In addition, the Company will restructure its institutional sales trading business in a manner to better align it with retail activity. *Total severance, restructuring and other exit charges are estimated to*

*be approximately $32 million, the majority of which will occur in the fourth quarter.*

*As a result of the actions outlined above, the Company is revising its earnings outlook for 2007* to account for 1) higher provision for loan losses; 2) potential securities impairments; 3) slower balance sheet growth and composition expectations; and 4) exit and other restructuring charges. *For the full year 2007, E\*TRADE FINANCIAL expects GAAP net income of between $450 million and $500 million, and earnings per share of between $1.05 and $1.15 per share. This is down from its previous range of $1.53 to $1.67.*

[Emphasis added.]

44.     As a result of this news,  over the next six trading days E\*TRADE shares fell

$2.32, or over 16.3 percent, to close on September 25, 2007 at $11.89 per share, on heavy trading

volume.

45.     On October 8, 2007, *BusinessWeek* published an article titled "E\*Trade's

Subprime Surprise," which included portions of an interview with Defendant Caplan. The article,

in relevant part, stated:

*On Sept. 17, E\*Trade Financial (ETFC ) CEO Mitch Caplan broke the bad news to Wall Street: The online brokerage would take a hit from the mortgage mess. The damage includes a $245 million expense for loan-loss provisions and up to an additonal [sic] $100 million for troubled investments tied primarily to second-lien loans and collateralized debt obligations. The expected changes in the second half of the year forced E\*Trade to cut its guidance for annual profits by 31%. But to many, the biggest surprise was that the firm was actually in the mortgage business. I asked Caplan to explain E\*Trade's exposure.*

\* \* \*

[Q]: **One Citigroup analyst says credit trends continue to deteriorate and disclosure at E\*Trade is still lacking. He feels that you did not recognize—or at least did not make clear to the market—that you had more exposure to bad credit than you let on.**

[A]: One of the things I pride this management team on is disclosure. I think if you look at our monthly metrics and, more important, our quarterly press releases, we give pages and pages of disclosure. *When you looked at our balance sheet, it was solid and...we had very little exposure in areas that were viewed as risk. I*

*thought we were giving appropriate levels of disclosure. And then we put out the 10Q, and added a risk factor because we own mortgages, and people went nuts.*

[Emphasis added.]

46.    Even after these revelations, the Company's stock price was still artificially inflated. On November 9, 2007, E*TRADE revealed that it would take a write-down on a portfolio of securities and mortgage-backed CDOs. E*TRADE also reported that the Securities and Exchange Commission had opened up an inquiry of the firm's loans and securities portfolios. Following this disclosure, a Citigroup analyst raised concerns of the Company's future viability. On November 12, 2007 (the first trading day after the write-down was announced), the Company's stock fell $5.04 per share, or 59 percent, to close at $3.55 per share on heavy trading volume.

47.    The market for E*TRADE securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, E*TRADE securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired E*TRADE common stock relying upon the integrity of the market price of E*TRADE securities and market information relating to E*TRADE, and have been damaged thereby.

48.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of E*TRADE securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented

- 23 -

the truth about the Company, its business and operations, as alleged herein.

49.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about E*TRADE's business, prospects and financial condition. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of E*TRADE and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed and the artificial inflation was removed from the price of E*TRADE stock.

## LOSS CAUSATION

50.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

51.    During the Class Period, Plaintiff and the Class purchased E*TRADE securities at artificially inflated prices and were damaged thereby. The price of E*TRADE securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

- 24 -

52.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading, knew that such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding E*TRADE, their control over, and/or receipt and/or modification of E*TRADE's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning E*TRADE, participated in the fraudulent scheme alleged herein.

53.    Moreover, during the Class Period, and with the Company's securities trading at artificially inflated prices, the Individual Defendants sold 122,211 shares of their personally held E*TRADE stock, garnering proceeds in excess of $2.8 million, as set forth in the following chart:

| Insider | Transaction Date | # of Shares | Price per Share | Proceeds |
|---------|-----------------|-------------|-----------------|----------|
| Mitchell Caplan | 2/26/2007 | 72,211 | $24.08 | $1,738,841 |
| Robert Simmons | 1/29/2007 | 5,000 | $23.85 | $119,250 |
| | | 3,070 | $23.90 | $73,373 |
| | | 3,000 | $23.89 | $71,670 |
| | | 2,663 | $23.88 | $63,592 |
| | | 2,000 | $23.82 | $47,640 |
| | | 2,000 | $23.87 | $47,740 |
| | | 2,000 | $23.93 | $47,860 |
| | | 1,930 | $23.94 | $46,204 |
| | | 1,337 | $23.84 | $31,874 |
| | | 1,000 | $23.86 | $23,860 |
| | | 1,000 | $23.92 | $23,920 |

| | 4/23/2007 | 10,000 | $21.80 | $218,000 |
|---|---|---|---|---|
| | | 5,000 | $21.65 | $108,250 |
| | | 5,000 | $21.70 | $108,500 |
| | | 2,500 | $21.75 | $54,375 |
| | | 2,500 | $21.90 | $54,750 |
| | **Cumulative Total:** | **122,211** | | **$2,879,700** |

### Applicability of Presumption of Reliance:
### Fraud On The Market Doctrine

54.    At all relevant times, the market for E*TRADE securities was an efficient

market for the following reasons, among others:

(a)    E*TRADE securities met the requirements for listing, and were listed

and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, E*TRADE filed periodic public reports with the

SEC and the NASDAQ;

(c)    E*TRADE regularly communicated with public investors via established

market communication mechanisms, including through regular disseminations of press releases

on the national circuits of major newswire services and through other wide-ranging public

disclosures, such as communications with the financial press and other similar reporting services;

and

(d)    E*TRADE was followed by several securities analysts employed by major

brokerage firms who wrote reports which were distributed to the sales force and certain

customers of their respective brokerage firms. Each of these reports was publicly available and

entered the public marketplace.

55.    As a result of the foregoing, the market for E*TRADE securities promptly

digested current information regarding E*TRADE from all publicly available sources and reflected such information in the price of E*TRADE securities. Under these circumstances, all purchasers of E*TRADE securities during the Class Period suffered similar injury through their purchase of E*TRADE securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

56.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of E*TRADE who knew that those statements were false when made.

## FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act
### and Rule 10b-5 Promulgated Thereunder
### Against All Defendants

57.    Plaintiff repeats and realleges each and every allegation contained above as if

fully set forth herein.

58.    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase E*TRADE securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

59.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for E*TRADE securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

60.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about E*TRADE's financial well-being, business, and prospects, as specified herein.

61.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices and a course of conduct as alleged herein in an effort to assure investors of E*TRADE's value and performance and continued substantial growth, which included the making of, or the

- 28 -

participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about E*TRADE and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of E*TRADE securities during the Class Period.

62.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

63.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and

for the purpose and effect of concealing E*TRADE's financial well-being, business relationships, and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's financial well-being, business relationships, and prospects throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

64.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of E*TRADE securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of E*TRADE securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired E*TRADE securities during the Class Period at artificially high prices and were damaged thereby.

65.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff, the other members of the Class, and the marketplace known the truth regarding the problems that E*TRADE was experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their E*TRADE securities, or, if they had acquired such securities during the Class Period, they would not have

done so at the artificially inflated prices which they paid.

66.    By virtue of the foregoing, defendants have violated Section 10(b) of the

Exchange Act and Rule 10b-5 promulgated thereunder.

67.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the

other members of the Class suffered damages in connection with their respective purchases and

sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

68.    Plaintiff repeats and realleges each and every allegation contained above as if

fully set forth herein.

69.    The Individual Defendants acted as controlling persons of E*TRADE within the

meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level

positions, and their ownership and contractual rights, participation in and/or awareness of the

Company's operations and/or intimate knowledge of the false financial statements filed by the

Company with the SEC and disseminated to the investing public, the Individual Defendants had

the power to influence and control and did influence and control, directly or indirectly, the

decision-making of the Company, including the content and dissemination of the various

statements which Plaintiff contends are false and misleading. The Individual Defendants were

provided with or had unlimited access to copies of the Company's reports, press releases, public

filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after

these statements were issued and had the ability to prevent the issuance of the statements or

cause the statements to be corrected.

70.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

71.    As set forth above, E*TRADE and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: November 16, 2007            **KIRBY MCINERNEY LLP**


By: _____
Ira M. Press    IP 5313
830 Third Ave, 10th Floor
New York, New York 10022
Telephone:    (212) 317-2300
Facsimile:    (212) 751-2540

**GLANCY BINKOW & GOLDBERG LLP**
Lionel Z. Glancy
Michael Goldberg
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Telephone:    (310) 201-9150
Facsimile:    (310) 201-9160

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem, Pennsylvania 19020
Telephone:    (215) 638-4847
Facsimile:    (215) 638-4867

**Attorneys for Plaintiff**

Exhibit A

START CERTIFICATION

GLANCY BINKOW & GOLDBERG LLP
SWORN CERTIFICATION OF PLAINTIFF WENDY M. DAVIDSON
E*TRADE FINANCIAL CORPORATION SECURITIES LITIGATION

I, Wendy M. Davidson, certify that:

1. I have reviewed the Complaint and authorized its filing.

2. I did not purchase E*TRADE Financial Corporation, the security that is the subject of this action, at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3. I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4. My transactions in the securities of E*TRADE Financial Corporation during the Class Period set forth in the Complaint are as follows:

    Bought 66 shares on 09-26-2007 for the price of $12.04

5. I have not served as a representative party on behalf of a class under this title during the last three years.

6. I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

____Check here if you are a current employee or former employee of the defendant Company.

I declare under penalty of perjury that the foregoing are true and correct statements.


Dated: November 6, 2007      /s/ *Wendy M. Davidson* _____
                             (Submitted Electronically)



END CERTIFICATION